UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

       -v-                   5:09-CR-418-2 (DNH)

BENJAMIN VILOSKI,

             Petitioner-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| UNITED STATES ATTORNEY<br>Northern District of New York<br>100 South Clinton Street<br>Syracuse, NY 13261 | STEVEN D. CLYMER, ESQ.<br>Ass't United States Attorney |
| HARRINGTON, MAHONEY<br>   LAW FIRM<br>Attorneys for Petitioner-Defendant<br>70 Niagara Street, 3rd Floor<br>Buffalo, NY 14202 | MARK J. MAHONEY, ESQ. |

DAVID N. HURD
United States District Judge

## DECISION & ORDER

## I. INTRODUCTION

Petitioner-Defendant Benjamin Viloski ("petitioner") is a disbarred lawyer

and former real estate broker who took unlawful advantage of his business

relationship with Dick's Sporting Goods ("DSG"), a sporting goods company

that operates a nationwide chain of retail stores.

In 2011, a Utica federal jury convicted petitioner of conspiring to engage in a fraudulent kickback scheme, mail fraud and money laundering crimes, and making a false statement to investigators.  As relevant here, the indictment alleged, and the jury was later charged on, two distinct theories of fraud.

The first theory of fraud was the kind that would be familiar to any reader (a scheme targeting other people's money).  But the second fraud theory was of a somewhat more technical variety (a scheme to deprive the business of the "right to control" the use of its assets).

Since at least 1991, this "right to control" theory was recognized as a valid way to prosecute someone for mail or wire fraud in our circuit.  *United States v. Wallach*, 935 F.2d 445, 461–64 (2d Cir. 1991).  But years after petitioner had finished serving his sentence in this case, the Supreme Court held that the "right to control" theory of fraud was invalid.  *Ciminelli v. United States*, 598 U.S. 306 (2023).

On May 10, 2024, petitioner filed this petition for a writ of error *coram nobis* seeking to vacate his conviction.  Dkt. No. 409.  The United States of America (the "Government") has opposed relief, Dkt. No. 413, petitioner has replied, Dkt. No. 420, and the parties have submitted supplemental briefing on recent Second Circuit precedent on this issue, Dkt. Nos. 421, 422.

The petition has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. __BACKGROUND__

Between 1998 and 2005, petitioner was a Pittsburgh-based attorney and real estate broker who worked with DSG on development projects, including the construction of DSG retail stores. Petitioner took unlawful advantage of this arrangement by conspiring with others to obtain illegal kickbacks in the form of brokerage and/or consulting payments from DSG's counterparties.

The scheme began with an insider—a man named Joseph Queri ("Queri"), one of DSG's senior vice presidents. Queri's job required him to identify real estate suitable for conversion into new DSG stores and to enter into contracts with real estate developers and landlords for this purpose.

As relevant here, it was common for businesses like DSG to retain brokers and/or consultants to facilitate these kind of real estate transactions, just as it was common for the developers and landlords (and *not* the big retailers) to pay the commissions and/or fees on these transactions.

Queri had the authority to select brokers and attorneys for this work. But Queri, who was experienced in these transactions, could often handle the job without the services of a broker. Although this experience should have saved on transaction costs, Queri and petitioner saw this as an opportunity to make some easy money by charging the fees anyway.

The men agreed that petitioner would pose as DSG's broker or consultant on these deals—he would have to do little or no work, but these transactions

would still generate commissions and/or fees.  Petitioner, for his part, would generate and submit sham agreements and fraudulent invoices, accept these unearned payments, and then funnel the fraudulent proceeds through front companies he created.  Petitioner kicked a share of this money back to Queri, who laundered the kickbacks through bank accounts and entities controlled by another man named Gary Gosson ("Gosson").

All told, this fraudulent scheme involved 27 development projects (22 of which directly involved petitioner) and resulted in $2.1 million in laundered proceeds.  Petitioner kicked back more than $1.2 million of this money to Queri as part of the scheme.  First in 2008 and again in 2009, petitioner made false statements to agents who were investigating these payments.

Eventually the scheme unraveled.  On November 18, 2009, a federal grand jury sitting in the Northern District of New York returned a first superseding indictment that charged petitioner with:

> Count One—conspiracy to commit mail and wire fraud, including deprivation of honest services mail and wire fraud in violation of 18 U.S.C. §§ 371, 1341, 1343, and 1346;
>
> Counts Two through Six—mail fraud and deprivation of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346;
>
> Counts Seven through Eleven—wire fraud and deprivation of honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346;

>> Count Twelve—conspiracy to commit money laundering and transactions in criminally derived property in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h) and 1957(a);
>
> Counts Thirteen through Fifteen—aiding and abetting concealment money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2;
>
> Counts Sixteen through Nineteen—aiding and abetting transactions in criminally derived property in violation of 18 U.S.C. §§ 1957(a) and 2; and
>
> Count Thirty-One—false statements in violation of 18 U.S.C. § 1001.

Dkt. No. 41. This indictment included a forfeiture allegation seeking, *inter alia*, a money judgment for the sum total of the ill-gotten gains. *See id*.

Notably, this indictment alleged that petitioner and his co-conspirators (Queri and Gosson) engaged in a kickback scheme that established <u>three</u> distinct grounds for fraud liability:

> (1) "to defraud [DSG], its shareholders, various landlords, real estate developers, investors, property owners and others involved in the development of new [DSG] stores . . . and to obtain money and property";
>
> (2) "to deprive [DSG] and its shareholders of the intangible right of the honest services of its officers and employees"; and
>
> (3) "to deprive [DSG] of potentially valuable information that could impact its economic decisions.

Dkt. No. 41 ¶ 10.

In the run up to trial, the Government notified the Court that it intended to abandon the <u>second</u> theory of liability in light of *Skilling v. United States*, 561 U.S. 358 (2010), which narrowed the range of conduct criminalized by 18 U.S.C. § 1346, the honest services fraud statute. *See* Dkt. No. 117.

The Government maintained that *Skilling* did not preclude § 1346 liability for the kickback scheme alleged in the indictment.[1]  Instead, the Government believed that omitting this theory of liability would avoid delay and simplify the jury instructions.  The Court agreed, Dkt. No. 131, and a redacted version of the first superseding indictment was prepared for the jury.  Dkt. No. 259.

Petitioner took the case to trial in the summer of 2011.  After roughly two weeks, the jury found petitioner guilty of the mail and wire fraud conspiracy charged in Count One, two substantive counts of mail fraud alleged in Counts Two and Five, the money-laundering conspiracy charged in Count Twelve, the two substantive counts of money laundering alleged in Counts Thirteen through Fifteen, the charge of engaging in transactions in criminally derived property in Count Sixteen, and making a false statement in Count Thirty-One.  Dkt. No. 261.  Petitioner was acquitted on the other counts. *Id.*

On January 13, 2012, after resolving post-trial motions, Dkt. No. 289, the Court sentenced petitioner to concurrent terms of 60 months' imprisonment,

---

[1] There is more to say about *Skilling*, which is covered in detail in the IV. Discussion *infra*.

three years of supervised release, and $75,000 in restitution to certain named victims. Dkt. No. 338. The Court also entered an order of forfeiture in the amount of $1,273,285.50, for which petitioner and two of his co-defendants (Queri and Gosson) were jointly and severally liable.[2] Dkt. Nos. 306, 343.

Petitioner took a direct appeal. Dkt. No. 333. A panel of the U.S. Court of Appeals affirmed his conviction and sentence but remanded for consideration of whether the forfeiture order might have violated the Eighth Amendment's Excessive Fines Clause. *See United States v. Viloski*, 557 F. App'x 28 (2d Cir. 2014) (summary order). Petitioner sought Supreme Court review, which was denied. *Viloski v. United States*, 575 U.S. 935 (2015).

On remand, the Court reconsidered the forfeiture order, concluded that it was constitutional under the circumstances, and reimposed the same money judgment. *United States v. Viloski*, 53 F. Supp. 3d 526 (N.D.N.Y. 2014).

Petitioner took another direct appeal, Dkt. No. 401, but this time around the Second Circuit rejected his arguments and affirmed. *See United States v. Viloski*, 814 F.3d 104 (2d Cir. 2016). Petitioner again sought Supreme Court review, which was denied. *Viloski v. United States*, 580 U.S. 1171 (2017).

On June 14, 2016, petitioner completed his prison sentence and began his term of supervised release, which expired on June 13, 2019. Dkt. No. 409 ¶ 6.

---

[2] The calculation of this total money judgment was conservative, reflecting only the kickback payments in which petitioner was personally involved. *See, e.g.*, Dkt. No. 304.

Petitioner remains liable for the unpaid money judgment imposed in the final order of forfeiture.  *See* Dkt. No. 410.

## III. <u>LEGAL STANDARD</u>

"A *coram nobis* petition is a collateral proceeding through which a court may correct fundamental errors in a prior final judgment." *Moskowitz v. United States*, 64 F. Supp. 3d 574, 577 (S.D.N.Y. 2014) (citing *United States v. Morgan*, 346 U.S. 502, 507–08 (1954)).  Relief is "strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996) (cleaned up).

To obtain *coram nobis* relief, a petitioner must show that: "1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) [he] continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Johnson v. United States*, 144 F.4th 133, 141–42 (2d Cir. 2025) (quoting *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014)).

"The burden is a heavy one because a court reviewing a petition for *coram nobis* relief 'must presume that the proceedings were correct, and the burden of showing otherwise rests on the petitioner.'" *United States v. Rutigliano*, 887 F.3d 98, 108 (2d Cir. 2018) (quoting *United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000)).

## IV. **DISCUSSION**

Petitioner argues he is entitled to *coram nobis* relief because the Supreme Court has "invalidated" the "foundation" of this prosecution. Dkt. No. 409 ¶ 7. As petitioner explains, in *Ciminelli v. United States*, the Supreme Court rejected the so-called "right to control" theory of fraud. *Id*. ¶ 8. Therefore, in his view, "he stands convicted for what the Supreme Court now holds is not a crime." *Id*. ¶ 9. Accordingly, petitioner contends that his conviction should be vacated and that he should be issued a refund. *See id*.

In opposition, the Government acknowledges that *Ciminelli* "narrowed the range of conduct that violates the mail and wire fraud statutes" and it agrees that *Ciminelli* "applies retroactively, including on a collateral attack" such as the one being asserted by petitioner. Dkt. No. 413 at 26 n.6.

But even so, the Government contends that petitioner's arguments fail to account for the fact that the indictment also alleged an <u>alternative</u> basis for liability—a "pecuniary" theory "involving tangible property in the form of money"—that remains completely valid even after *Ciminelli*. *Id*. at 27.

As the Government explains, the record establishes that the jury relied on this "pecuniary" theory of fraud when it convicted petitioner. Dkt. No. 413 at 28–30. In support of this argument, the Government points to the proof that petitioner's fraud scheme also deprived *other* businesses (and not just DSG)

of money—petitioner charged these victims bogus referral and consulting fees that were passed back to Queri.  Dkt. No. 413 at 28–30.

The Government emphasizes that this classic, familiar theory of fraud was alleged in the indictment, proven at trial, charged to the jury, recognized by this Court in its restitution order, and (at least indirectly) affirmed on direct appeal.  Dkt. No. 413 at 28–40.  Thus, in the Government's view, *Ciminelli* is not enough to establish a basis for extraordinary *coram nobis* relief.  *See id*.

*Coram nobis* "functions as a *habeas* analogue for non-custodial aspects of a criminal punishment."  *Moskowitz*, 64 F. Supp. 3d at 577 (citing *Kaminski v. United States*, 339 F.3d 84, 89–90 (2d Cir. 2003).  "Like *habeas* relief, *coram nobis* relief lies in tension with the public's interest in finality of judgment."  *Id.* (citing *Foont*, 93 F.3d at 80).

"An important difference between habeas relief and *coram nobis* lies in the fact that, because the latter comes after the petitioner has completed his sentence, the petitioner will not be retried; thus, the granting of *coram nobis* normally results in the expungement of the conviction, with no possibility of further proceedings to determine whether the petitioner was guilty of the offense charged."  *United States v. Mandanici*, 205 F.3d 519, 532 (2d Cir. 2000) (Kearse, J., concurring).

Upon careful review of the record, and mindful of the extraordinary nature of *coram nobis*, petitioner is not entitled to relief because he has not satisfied

the first element needed for *coram nobis* relief, *i.e.*, "there are circumstances compelling such action to achieve justice."

The record shows just the opposite is true: granting petitioner relief would result in the expungement, without the possibility of reinstatement, of the conviction of someone who was validly convicted of mail fraud by the jury on a straightforward theory—that he schemed to deprive the victims of money.[3]

To understand why, it helps to unpack the history of the federal mail and wire fraud statutes. The modern version of these statutes trace their history back to the original mail fraud law, which was enacted in 1872 as part of the recodification of the postal code. *See McNally v. United States*, 483 U.S. 350, 356 (1987).

This original statute criminalized use of the mails to advance "any scheme to artifice or defraud." *Skilling*, 561 U.S. at 399. In 1909, Congress amended the statute to include language that also criminalized "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Id.* (citation omitted).

---

[3] As discussed *infra*, petitioner has not sought *coram nobis* relief from his felony conviction for making a false statement. *See* Dkt. Nos. 409, 410. After the Government pointed this out, Dkt. No. 413 at 9 n.1, petitioner demanded a new trial on that conviction in his reply. Dkt. No. 420. Putting aside the fact that it is usually improper to raise new arguments in a reply, there is no need to reach that issue under these circumstances. But if there were a reason to do so, the Court agrees with the Government: there is no legal rule that would permit petitioner to seek a new trial at this very late stage of the case. *See* Dkt. No. 422 at 1 n.1.

That basic formulation remains true today.  Currently, the mail *and* wire fraud statutes make it a crime to devise, or to intend to devise, "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343.

But a good deal of change has come to this area of criminal law since the 1909 congressional amendment.  Without getting bogged down in the details, Congress's choice of language—the amendment is phrased with a disjunctive "or"— gave courts license to broaden the scope of criminal liability for fraud "to include deprivations not only of money or property, but also of intangible rights."  *Skilling*, 561 U.S. at 400.

These "intangible rights" included a wide range of concepts, stretching out to cover everything from the right to "honest services," *Skilling*, 561 U.S. at 400, to far more abstract theories of harm, such as "the right of the citizenry to an honest election."  *Ciminelli*, 598 U.S. at 313 (cleaned up).

As relevant here, every circuit court in the country eventually decided that the mail fraud statute criminalized an "intangible right" to "honest services," *i.e.*, that an employee "could be prosecuted under the mail-fraud statute if he breached his allegiance to his employer by accepting bribes or kickbacks in the course of his employment."  *Skilling*, 561 U.S. at 401 (cleaned up).

The Supreme Court disagreed.  In 1987, in *McNally v. United States*, 483 U.S. 350, the Supreme Court rejected this "intangible rights" theory of fraud.

In brief, *McNally* was about a state official who was responsible for selecting the state's insurance agent.  *Id*. at 352.  The official arranged a kickback of fees from the agent in exchange for the state's business.  *Id*. at 352–53.

Notably, the state's prosecution had <u>not</u> charged this corrupt official with defrauding the state of any money or property, alleged that the state might have paid a lower premium or obtained better insurance elsewhere, or even claimed that the state had been "deprived of control over how its money was spent."  *McNally*, 483 U.S. at 360.

Instead, the prosecution's theory of the case was simply that the corrupt state official's kickback scheme had "defrauded the citizens and government" of "intangible rights," such as the right to have the state's affairs "conducted honestly."  *McNally*, 483 U.S. at 352.

The Supreme Court rejected this rationale and reversed the convictions of the state official and his co-defendant.  "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," the Court held that the mail fraud statute is "limited in scope to the protection of property rights."  *McNally*, 483 U.S. at 360.

Notably, however, the Supreme Court in *McNally* suggested that Congress could criminalize "honest services" fraud if it passed a new law.  And in 1988, Congress responded by enacting a new statute "specifically to cover one of the

'intangible rights' that lower courts had protected . . . prior to *McNally*: 'the intangible right of honest services.'" *Cleveland v. United States*, 531 U.S. 12, 19–20 (citation omitted).

This new honest services fraud statute, codified at 18 U.S.C. § 1346, relies on the existing mail (§ 1341) and wire (§ 1343) fraud statutes. Section 1346 provides that a "scheme to artifice or defraud" (defined by the existing mail and wire fraud statutes) "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

As with mail and wire fraud, the honest services fraud statute remains on the books. But as before, prosecutions under this statute eventually crossed the boundaries of the "core" intangible interests covered under § 1346. Thus, in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court weighed in again, holding that § 1346 criminalizes "*only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 410 (emphasis in original).

But that is only half of the story of "intangible rights." After *McNally* was decided in 1987, and independent of the new honest services fraud law that Congress enacted in response in 1988, some federal courts started developing the pre-*McNally* "intangible interests" doctrine along a different axis.

These courts relied on a passing reference in *McNally*—the one about how the state had not been "deprived of control over how its money was spent"—to

endorse mail and wire fraud prosecutions based on an entirely new theory of "intangible rights."

This theory was based on the deprivation of a victim's "right to control" its own assets or, relatedly, the deprivation of "potentially valuable information" that could impact a victim's discretionary economic decisions.  *United States v. Finazzo*, 850 F.3d 94, 112 (2d Cir. 2017).  The Second Circuit soon endorsed this novel theory, reasoning that the "right to control" qualified as a "property interest."  *United States v. Wallach*, 935 F.2d 445, 462–63  (2d Cir. 1991).

This intangible "right to control" theory of fraud liability was distinct from the deprivation of the intangible right to "honest services" (enacted in § 1346 and limited by *Skilling*) <u>and</u> from the traditional, tangible theory of mail and wire fraud that has been with us forever: based on a scheme to target "money or property."  *See United States v. Walker*, 191 F.3d 326, 335 (2d Cir. 1999).

This was the state of affairs in 2009, when a grand jury returned the first superseding indictment against petitioner.  In the Second Circuit, there were <u>three</u> viable theories of mail and wire fraud, and the indictment charged him with all three of them: (a) "pecuniary" fraud, which involved the deprivation of money and property; (b) "honest services mail fraud" based on § 1346; and (c) the "right to control" theory.  Dkt. No. 41.

As noted *supra*, the Government abandoned the (b) "honest services mail fraud" theory in the pre-trial proceedings after the Supreme Court decided

*Skilling v. United States* in the summer of 2010. Dkt. No. 117. Thus, when petitioner finally went to trial the next summer, only the (a) the "pecuniary" theory and the (c) "right to control" theory remained. *See* Dkt. No. 259.

On July 29, 2011, after being charged on both theories, the jury convicted petitioner of conspiracy to commit mail and wire fraud and two substantive counts of mail fraud. Dkt. No. 261. Petitioner served his prison time and was released from supervision on June 13, 2019. Dkt. No. 409 ¶ 6.

Although it declined to take up petitioner's conviction, the Supreme Court had not finished limiting the reach of the federal fraud statutes. Years after petitioner was released from custody, the Supreme Court decided *Ciminelli v. United States*, 598 U.S. 306 (2023). In *Ciminelli*, the Supreme Court rejected the "right to control" theory of fraud. *Id.* There, the Court reiterated that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests," like money. *See id.* at 316.[4]

This recitation of the history of the federal fraud statutes brings us to the central question presented by petitioner's *coram nobis* petition: what impact, if any, should *Ciminelli* have on his conviction? Ordinarily, when "a jury is presented with an illegal or unconstitutional basis for conviction and a legally

---

[4] *Ciminelli* cited petitioner's prosecution when observing that the "right to control" theory risked criminalizing "almost any deceptive act." 598 U.S. at 315 (citing *United States v. Viloski*, 557 F. App'x 28 (2d Cir. 2014) (summary order)).

valid basis, a so-called *Yates* error[5] arises if the jury returns a general verdict and a court cannot determine upon which basis the jury convicted." *Johnson*, 144 F.4th at 142 (citing *Griffin v. United States*, 502 U.S. 46, 56 (1991)).

Of course, at the time of the jury's verdict in this case the "right to control" theory had not been recognized as "illegal or unconstitutional." But that does not matter for the purpose of *coram nobis* review. *Johnson*, 144 F.4th at 142. Indeed, the Government candidly acknowledges as much. Dkt. No. 413 at 26 & n.6.

Importantly, however, "*Yates* errors are not structural and are subject to harmlessness review." *Johnson*, 144 F.4th at 142. There are two harmless error standards. The first is from *Kotteakos v. United States*, 328 U.S. 750 (1946). *Kotteakos* requires the Government to demonstrate that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." The second one is from *Chapman v. California*, 386 U.S. 18, 24 (1967). *Chapman* requires the Government to demonstrate that the error "was harmless beyond a reasonable doubt." Under either of these standards, the Government bears the burden of persuasion. *Johnson*, 144 F.th at 143.

The last-ditch procedural posture of this *coram nobis* petition means that the harmless error standard from *Kotteakos* applies. As the Supreme Court

---

[5] So named for *Yates v. United States*, 354 U.S. 298 (1957).

explained, "[t]he *Kotteakos* harmless-error standard is better tailored to the nature and purpose of collateral review than the *Chapman* standard." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

The *Kotteakos* standard is met when the judge is in "grave doubt" about the trial error's impact on the jury. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). "A judge is in 'grave doubt' when the matter is so evenly balanced that the judge feels himself in virtual equipoise as to the harmlessness of the error.'" *Peck v. United States*, 106 F.3d 450, 454 (2d Cir. 1997) (quoting *O'Neal*, 513 U.S. at 435).

Measured against this general body of law, the particular facts that were proven at trial establish that the *Yates* error was harmless.[6] "Where there are several ways to violate a criminal statute, as there are with the mail fraud statute, federal pleading requires that an indictment charge in the conjunctive to inform the accused fully of the charges." *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) (cleaned up).

Typically, "[a] conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged."

---

[6] The Second Circuit has suggested that the Supreme Court's rationale for "preferring *Kotteakos* in collateral review" might not be applicable where, as here, a petitioner seeks to vacate "a federal conviction originating in this Circuit." *Johnson*, 144 F.4th at 143. However, because the question of whether *Kotteakos* or *Chapman* applies in *coram nobis* remains an open one in this circuit, *see id.* at 142–43, and because *coram nobis* is an "extraordinary remedy" reserved for "extreme cases," *Denedo*, 556 U.S. at 916, the Court will rely on the Supreme Court's existing guidance and apply *Kotteakos*.

*McDonough*, 56 F.3d at 390 (citation omitted).  As explained *supra*, the jury

wound up considering whether petitioner had committed mail or wire fraud

in <u>two</u> distinct ways: (a) the "pecuniary" theory and the (c) "right to control"

theory.  The jury was instructed that it could convict petitioner under <u>either</u>

theory.  Dkt. No. 413 at 27–28 (summarizing relevant trial transcript).

Further, in denying petitioner's post-trial motions, the Court found that

the trial evidence supported both theories of fraud as to DSG:

> THE COURT: . . . . [T]here was sufficient proof to
> establish [petitioner's] guilt on the mail fraud and
> conspiracy to commit mail and wire fraud counts.  The
> proof at trial did not establish merely a breach of
> fiduciary duty.  To the contrary, there was evidence
> that false representations were made to [DSG], that
> [DSG] suffered a loss, and there was intent to defraud.
>
> Further, over objections by the defense, it was made
> clear that the failure to disclose information may
> constitute a fraudulent representation under certain
> conditions.  The concept that the scheme to defraud
> must result in actual loss or the receipt of money or
> property has also been rejected.  It is enough that the
> scheme to defraud was intended to deprive another of
> a property right.

Dkt. No. 388 at 32.  Notably, in addition to the evidence proving that DSG

was a victim of the fraud scheme and conspiracy, there was plenty of proof

that the scheme and conspiracy also deprived other businesses of tangible

property—money.

For instance, petitioner schemed "Classic Real Estate," a family-owned real estate brokerage, out of $25,000 as a sham "referral fee" to one of the front companies that petitioner created to facilitate the fraud scheme. Dkt. No. 413 at 28–29 (summarizing trial testimony). Likewise, a second victim, "COR Development," forked over $50,000 after another one of petitioner's front companies sent a bogus invoice for consulting fees. *See id*. at 29–30.

After petitioner's conviction, the Government sought restitution for these two victims (and for DSG). Dkt. No. 318. The Court ordered petitioner to pay restitution in the amounts of $25,000 to Classic Real Estate and $50,000 to COR Development. Dkt. No. 338.

Importantly, as the Government points out, the indictment did not allege the "right to control" theory of fraud as to these two businesses. Instead, the indictment only alleged that these two victims were subjected to the classic, tangible "pecuniary" theory of fraud—a scheme to wrongfully deprive them of their money. Dkt. No. 413 at 31 (citing Dkt. No. 41 at 4–5).

In short, the trial evidence established that the Government proved this pecuniary theory of fraud. And under these particular circumstances, there is no indication that the *Yates* error—the fact the jury was charged on two alternate bases of fraud, one of which was later shot down by the Supreme Court—had a "substantial and injurious effect or influence" on the verdict.

Petitioner tries to avoid this conclusion by pointing to *Johnson v. United States*, 144 F.4th 133 (2d Cir. 2025), a recent case in which the Second Circuit vacated and remanded with instructions to grant a writ of error *coram nobis* to a petitioner who had been convicted by a jury of wire fraud and conspiracy to commit wire fraud.

The facts of *Johnson* are complex.  Briefly stated, though, the defendant was the global head of a massive bank's foreign exchange trading desk.  He was charged with wire fraud for his role in a transaction in which his bank-employer "converted U.S. Dollars into 2.25 billion British Pounds" for an oil and gas company.  144 F.4th at 136.

As relevant here, the jury in the *Johnson* defendant's case considered two theories of fraud: a valid "misappropriation" theory of fraud *and* the since-invalidated "right to control" theory of fraud.  144 F.4th at 136.  Thereafter, the  jury returned a general verdict that convicted the defendant and, after he exhausted his appeals, the defendant completed his prison sentence.  *Id.*

As here, the defendant sought *coram nobis* relief after the Supreme Court decided *Ciminell*, which invalidated the "right to control" theory of fraud.  As here, the Government opposed relief on the ground that submitting the now-invalid theory to the jury was harmless error because the defendant was also convicted under a valid, alternate "misappropriation" theory of wire fraud.

The trial court denied *coram nobis* relief. *Johnson*, 144 F.4th at 136. But the Second Circuit reversed with instructions to grant the writ. In doing so, the *Johnson* panel reasoned that the Government's alternate theory against the defendant "was weak" and it was therefore "very unlikely" to have been an independent basis for his conviction. *Id*.

The problem for petitioner is that *Johnson* is readily distinguishable from what happened in this prosecution. Notably, the defendant in *Johnson* was a sophisticated investment banker charged with relatively complicated theories of fraud: the "right to control" and the "misappropriation" theories.

As the Second Circuit explained in detail, this "misappropriation" theory was far *more* "complicated and contestable" than the already complex "right to control" theory. *Johnson*, 144 F.4th at 146. Under the circumstances of that case, the appellate panel was left with "grave doubt" about whether that jury "would have reached unanimous agreement on the more complicated and contestable misappropriation theory when it had the right-to-control theory as an available alternative." *Id*.

Exactly the opposite is true in this case. The jury was presented with the "right to control" theory of fraud alongside a much more straightforward one: a scheme to obtain money from the victims. There is a strong basis in this record—as set out in detail *supra*—to conclude that the jury voted to convict petitioner on the still-valid, far less complicated theory. Unlike *Johnson*, this

record does not permit much doubt, let alone any "grave doubt." Accordingly, *Ciminelli* does not warrant *coram nobis* relief.

Petitioner's remaining arguments fare no better. To warrant *coram nobis* relief, a petitioner must show that he "continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Kovacs*, 744 F.3d at 49. Broadly speaking, petitioner identifies three: (1) the loss of his law and real estate licenses; (2) his inability to travel abroad, including to Canada; and (3) his liability for the forfeiture order. Dkt. No. 410 at 19–21.

First, as the Government points out, petitioner has failed to challenge his felony conviction for making a false statement (in Count 31). Thus, even if *coram nobis* relief were otherwise appropriate, petitioner would have a valid felony conviction. So it is unclear how vacatur of the fraud counts would let him recover his licenses. *United States v. Persico*, 242 F.3d 369 (2d Cir. 2000) (summary order) (affirming denial of *coram nobis* where petitioner "would remain a convicted felon (with all the attendant legal consequences) even if his [other counts of conviction] were vacated"); *United States v. Verrusio*, 2017 WL 1437055, at *10 (D.D.C. Apr. 21, 2017) ("Even if defendant's convictions for Counts One and Two were vacated, however, his felony conviction on Count Three for making a false statement . . . would remain intact, along with all its encumbrances under [ ] State and Federal law . . . .").

Second, in addition to the issue of how this still-valid felony conviction for making a false statement would impact his ability to travel abroad, it is hard to see how a foreign government's admissibility policies can qualify as a legal harm that is cognizable for purposes of *coram nobis* relief. *Howard v. United States*, 962 F.2d 651, 655 (7th Cir. 1992) (opining that "the loss of the right to travel to a foreign country does not appear to be a civil disability of the type justifying the issuance of a writ of error coram nobis"); *but see Johnson*, 144 F.4th at 142 (accepting lower court's finding about restriction on travel).

Third, although it seems like it should be easy to do, petitioner has failed to explain how his liability for the still-unpaid order of forfeiture is the kind of ongoing legal harm that would justify *coram nobis* relief, especially in light of the fact that, at best, this kind of extraordinary relief would only seem to be appropriate as to the fraud counts of conviction.

The Government offers reasons to conclude that this still-unpaid forfeiture might not even qualify as an ongoing legal harm, at least for the purpose of *coram nobis* relief. Dkt. No. 413 at 43–44. Although that is counterintuitive, petitioner has not put together a good argument to the contrary.

Instead, petitioner simply argues that in the absence of a valid conviction, the collateral consequences of that conviction must be vacated. Dkt. No. 410 at 19–20. Although that is likely an accurate statement of the law, *United States v. Libous*, 858 F.3d 64, 67 (2d Cir. 2017), it does not grapple with the

nuance that would be presented in a case like this one, where even if relief were appropriate at least one felony count of conviction would remain valid.

In sum, petitioner is not entitled to *coram nobis* relief because, under the circumstances of this case, the *Yates* error was harmless.  Because the record strongly shows that the jury convicted petitioner on a completely valid theory of fraud, he cannot show that "there are circumstances compelling [ ] action to achieve justice."  Accordingly, the petition will be denied.

## IV.  CONCLUSION

Therefore, it is

ORDERED that

1.  Petitioner-Defendant's (Dkt. No. 409) motion is DENIED.

IT IS SO ORDERED.

Dated:  January 14, 2026
        Utica, New York.

David N. Hurd
U.S. District Judge